RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

AMY MATCHISON (CABN 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6422
Fax:       (202) 307-0054
E-mail: Amy.T.Matchison@usdoj.gov
        Western.Taxcivil@usdoj.gov

NICOLA T. HANNA
United States Attorney
312 North Spring Street, Suite 1200
Los Angeles, California 90012

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. |
| Petitioner, | **DECLARATION OF JAMES PACK** |
| v. | |
| FRANK AGRAMA | |
| Respondent. | |

I, James Pack, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a duly commissioned Revenue Agent of the Internal Revenue Service employed in the Small Business & Self Employed Division, Special Enforcement Program, Field Operations in Camarillo, California.

2. The IRS is conducting an examination of the federal income tax liability of

Frank and Olfet Agrama for the tax years 1997 through 2009, and 2011.

3.     In my capacity as a Revenue Agent, I have been assigned to the aforementioned examination since January 2015.  I am authorized to issue administrative summonses pursuant to 26 U.S.C. § 7602, 26 C.F.R. § 301.7602-1, and IRS Delegation Order No. 25-1.

4.     The facts set forth in the paragraphs below are based on my personal knowledge, the IRS's files concerning the federal tax liabilities of the Agramas, and a review of documents produced to date by the Agramas in response to information document requests, treaty requests, third-party contacts, and discussions with IRS staff.

5.     In furtherance of the examination and in accordance with 26 U.S.C. § 7602, on June 5, 2018, I issued an IRS summons directing Mr. Agrama to appear on July 9, 2018, and to produce for examination books, records, papers, and other data as described in said summons.  A copy of the summons is attached as Exhibit A.

6.     In accordance with a written waiver executed by Mr. Agrama, on June 5, 2018, I served the summons by hand delivery to the Agramas' counsel, Dennis Perez.  A copy of the waiver is attached as Exhibit B.

7.     In accordance with 26 U.S.C. § 7609, on June 6, 2018, I sent separate notice of the summons described above by certified mail to Mrs. Agrama and by hand delivery to Mr. Perez on June 5, 2018.

8.     Mr. Agrama failed to appear on July 9, 2018, the date scheduled for compliance with the summons, and did not produce the books, records, papers, and other

data demanded in the summons. Instead, through his attorney, Mr. Agrama sought and received several extensions of time to respond to the summons. The last extension of time expired on October 31, 2018, without Mr. Agrama having produced all of the books, records, papers and other data demanded by the summons. Although Mr. Agrama has produced some of the summoned material, his failure to fully comply with the summons continues to this date.

9. The books, records, papers, and other data demanded in the summons are not already in the possession of the IRS. During the course of the examination, the Agramas have provided the IRS with some documents. To the extent Mr. Agrama earlier provided documents that would also be responsive to a summons request, the IRS is not seeking production of those documents.

10. The IRS has come into possession of copies of certain documents that are demanded in the summons including a copy of a report (without attachments) written by Gabriella Chersicla ("Chersicla Report"), dated December 9, 2013, and other documents provided to the Italian government.

11. All administrative steps as required by the Internal Revenue Code for issuance and service of the summons have been followed.

12. The books, records, papers, and other data sought by the summons may be relevant to determine the correct federal income tax liability of Frank and Olfet Agrama for the tax years 1997 through 2009, and 2011.

13. There is no "Justice Department referral," as that term is described in

Section 7602(d)(2) of the Internal Revenue Code, in effect with respect to Frank or Olfet Agrama for tax years 1997 through 2009, and 2011.

14. On December 10, 2009, the Mr. and Mrs. Agrama requested preliminary clearance to voluntarily disclose to the IRS's voluntary disclosure program the existence of foreign bank accounts for which they and their daughter had signatory authority, but for which they contended they were not the beneficial owners.

15. In furtherance of their voluntary disclosure, Mr. and Mrs. Agrama affirmatively represented to the IRS on September 1, 2010, that they were not under criminal investigation by any law enforcement authority.

16. By letter dated September 9, 2010, the Agramas were informed by the IRS that their voluntary disclosure had been preliminarily accepted. They were also informed that their acceptance was conditioned upon the information they provided remained, "truthful, timely, and complete." They were also informed that their "voluntary disclosure would be forwarded for civil examination and the determination of the correct tax liability." A copy of the September 9, 2010 letter is attached as Exhibit C.

17. On May 19, 2011, based on their voluntary disclosure, Mr. and Mrs. Agrama's 2009 tax return was selected for examination.

18. In April 2012, during the review of the Agramas' voluntary disclosure, Mr. Perez told the IRS that he was working with a French attorney on a case. Mr. Perez also informed the IRS that Mr. Agrama's funds held at UBS were frozen.

19. After Mr. Perez's disclosure of information in April, IRS research revealed

that Mr. Agrama was under criminal indictment in Italy. The IRS later learned that Mr. Agrama was convicted of tax evasion in Italy on October 26, 2012, and was given a three-year sentence.

20. By letter dated February 13, 2013, the Agramas were informed that their acceptance into the IRS's voluntary disclosure program was rescinded. A copy of the February 13, 2013 letter is attached as Exhibit D.

21. IRS procedures provide for the automatic examination of any taxpayer who is removed from the voluntary disclosure program.

22. After the Agramas' rescission from the voluntary disclosure program, the IRS expanded its examination to include additional tax years.

23. Mr. Agrama was born in Egypt and lived in Italy. In 1977, he moved to the United States and later became a U.S. citizen.

24. Mr. Agrama is a writer, director, producer, and distributor of television films and operates a number of U.S. television production companies, including Harmony Gold (USA), Inc.

25. Beginning in the 1970s, Mr. Agrama purchased broadcasting rights for movies and television shows, primarily from Paramount Pictures, Inc. Mr. Agrama then resold these broadcasting rights at inflated prices to foreign companies, including Principal Network LTD (British Virgin Islands) and International Media Services (Malta). Those foreign companies then resold the broadcasting rights to Italian companies such as Mediaset, Italy's largest broadcasting firm. Some of the foreign

companies were founded and owned by Silvio Berlusconi, the former Italian Prime Minister.

26. Mr. Agrama established Harmony Gold (Hong Kong), Wiltshire Trading Ltd. (Hong Kong), Melchers Ltd. (Netherland Antilles), Meadowview Overseas Ltd. (Ireland) and Olympus Trading Ltd. (Ireland), to do business with the Berlusconi companies.

27. Initially, Mr. Agrama operated the foreign entities he established, and for which he was the true beneficial owner, with the assistance of Victor Wong. However, in 1992, Mr. Agrama transferred the operational business to a Hong Kong nominee service company, operated by Paddy Chan Mei-yiu. Paddy Chan and her employee Katherine Hsu May-chun served as the nominee administrators for the Agramas' foreign entities and helped them disguise their ownership by falsely claiming to be the beneficial owners.

28. Mr. Agrama would use the foreign entities he created to disguise his purchase and resale of the broadcasting rights.

29. Mr. Agrama claims that the profits from the resale of the broadcasting rights belong to the foreign entities and are therefore not subject to U.S. taxation. He purports to be only a salaried employee (commercial representative) of the foreign entities.

30. The IRS is not aware of any purpose, other than to obscure the identity of the parties involved in a sale, for using foreign entities administered in Hong Kong to sell U.S. broadcast rights in Europe.

31. From 1998 to 2002, Mr. Agrama purchased broadcast rights for $130 million

and sold them for $315 million.  The Agramas failed to report that $185 million of profit on their U.S. tax returns.

32.   The Agramas deposited the diverted profits into offshore financial accounts held by them directly or through the foreign entities they owned and controlled.

33.   In 2005, as a result of an Italian investigation into Prime Minister Berlusconi, Mediaset, and Mediatrade (a subsidiary of Mediaset), Mr. Agrama and 13 co-defendants (including Berlusconi) were indicted and later tried in Italy for false accounting, embezzlement, and tax related crimes.

34.   At trial, it was revealed that intermediary offshore companies purchased broadcasting rights from Paramount Pictures and other studios and then later resold the rights to Mediaset and others at inflated prices.  Prime Minister Berlusconi and Mr. Agrama were both convicted in October 2012 of crimes related to the sales.  As referenced earlier, Mr. Agrama was sentenced to three years for tax evasion.

35.   In March 2010, Mr. Agrama, Paddy Chan, Katherine Hsu, the son of Prime Minister Berlusconi, and others were charged in Italy with reselling broadcast rights to Mediatrade at inflated prices and laundering the profits.

36.   Mr. Agrama was acquitted in the second trial in part because statutes of limitation barred a number of the years under investigation.

37.   The Italian investigations scrutinized not just the activities of Mr. Agrama, but also examined his companies Harmony Gold (USA) Inc., Harmony Gold (Hong Kong), Wiltshire Trading Ltd. (Hong Kong), Melchers Ltd. (Netherland Antilles), and

Olympus Trading Ltd. (Ireland/Isle of Man/Netherland Antilles).

38. Likewise, two of Paddy Chan's nominee service companies were investigated.

39. The Italian government participated with Swiss authorities in a joint investigation of Mr. Agrama and his foreign entities. In addition, the Italian prosecutor made Mutual Legal Assistance treaty requests, as relevant here, to Hong Kong and Ireland.

40. The Italian treaty requests were unsuccessfully challenged in local courts in both countries.

41. The summons attached as Exhibit A seeks several categories of documents that relate to the two Italian trials of Mr. Agrama or were otherwise provided to the Italian government by other countries. In addition, the summons seeks documents related to Mr. Agrama's unsuccessful challenge to the Italian treaty request in Ireland.

42. The documents produced by the Hong Kong authority were submitted as evidence during the Mediatrade trial by the Italian prosecutor and were also given to Mr. Agrama.

43. Moreover, Mr. Agrama's attorney Evan Davis has represented to the IRS that the documents provided by the Irish authority to the Italian prosecutor were submitted as evidence at the Mediatrade trial.

44. These documents may be relevant in determining the proper amount of income attributable to the Agramas and therefore their correct federal income tax liability

for tax years 1997 through 2009, and 2011.

45. The IRS has not assessed any additional income taxes or penalties against Mr. and Mrs. Agrama.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of October, 2019.

JAMES PACK
Revenue Agent
Internal Revenue Service

9