Alejandro N. Mayorkas (SBN 122447)
alejandro.mayorkas@wilmerhale.com
Matthew D. Benedetto (SBN 252379)
matthew.benedetto@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
(213) 443-5300 Telephone
(213) 443-5400 Facsimile

David M. Lehn (*pro hac vice* forthcoming)
david.lehn@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000 Telephone
(202) 663-6363 Facsimile

*Attorneys for Respondent*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:19-cv-09204 DDP(JCx) |
| *Petitioner*, | **RESPONSE TO ORDER TO SHOW CAUSE AND MEMORANDUM IN SUPPORT OF MOTION FOR EVIDENTIARY HEARING** |
| v. | |
| FRANK AGRAMA, | |
| *Respondent*. | |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................ii

INTRODUCTION .................................................................................. 1

STATEMENT OF FACTS ..................................................................... 4

    A.    The Unlawful Searches of Mr. Agrama's Home and Office
        by an Italian Prosecution Team .................................................. 4

    B.    The Italian Prosecution Team Obtains Documents from Hong
        Kong and Ireland Pursuant to Mutual Legal Assistance Treaties ....... 6

    C.    The IRS Initiates an Investigation of Mr. Agrama on the Basis
        of the MLAT Documents .................................................... 7

ARGUMENT ...................................................................................... 10

I.    The Standards Governing Judicial Enforcement of an IRS Summons ....... 10

II.    The Summons Is in Bad Faith Because It Seeks Documents Already
      Possessed by the IRS ................................................................ 12

III.    The Summons Is in Bad Faith Because It seeks to Circumvent
      International Legal Restrictions on the Disclosure of the Summoned
      Documents ............................................................................. 14

IV.    The Summons Is in Bad Faith Because the IRS's Investigation Is
      Founded on Documents It Obtained Unlawfully ......................... 19

CONCLUSION .................................................................................. 25

1
2

# TABLE OF AUTHORITIES

**Page(s)**

3

## FEDERAL CASES

4
5

*Action Recycling Inc. v. United States*,
   721 F.3d 1142 (9th Cir. 2013) ..................................................... 13, 14

6
7

*In re Chase Manhattan Bank*,
   297 F.2d 611, 613 (2d Cir. 1962) ................................................ 17, 18

8
9

*FTC v. Compagnie De Saint-Gobain-Pont-a-Mousson*,
   636 F.2d 1300 (D.C. Cir. 1980) ........................................................ 18

10
11

*Crystal v. United States*,
   172 F.3d 1141 (9th Cir. 1999) .......................................................... 11

12

*Fortney v. United States*,
   59 F.3d 117 (9th Cir. 1995) .............................................................. 11

13
14

*Gluck v. United States*,
   771 F.2d 750 (3d Cir. 1985) ................................................. 19, 20, 23

15
16

*Ings v. Ferguson*,
   282 F.2d 149 (2d Cir. 1960) ............................................................. 17

17
18

*Samann v. Commissioner of Internal Revenue*,
   313 F.2d 461 (4th Cir. 1963) ............................................................ 17

19
20

*Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
   357 U.S. 197 (1958)........................................................................... 17

21
22

*United States v. Bank of Commerce*,
   405 F.2d 931 (3d Cir.1969) .............................................................. 20

23
24

*United States v. Beacon Federal Savings & Loan*,
   718 F.2d 49 (2d Cir. 1983) ............................................................... 20

25
26

*United States v. Clarke*,
   573 U.S. 248 (2014)........................................................... 10, 11, 25

27
28

*United States v. Clarke*,
   816 F.3d 1310 (11th Cir. 2016) ....................................................... 19

*United States v. Danielson,*
 325 F.3d 1054 (9th Cir. 2003) ........................................................... 21

*United States v. LaSalle National Bank,*
 437 U.S. 298 (1978) ........................................................................... 11

*United States v. Michaud,*
 907 F.2d 750 (7th Cir. 1990) ............................................................ 10

*United States v. Powell,*
 379 U.S. 48 (1964) ...................................................................... 10, 14

*United States v. Richey,*
 632 F.3d 559 (9th Cir. 2011) ...................................................... 10, 11

*United States v. Stuart,*
 489 U.S. 353 (1989) ............................................................. 10, 11, 17

*United States v. Stuckey,*
 646 F.2d 1369 (9th Cir. 1981) .......................................................... 12

*United States v. Tanoue,*
 94 F.3d 1342 (9th Cir. 1996) ............................................................ 11

*United States v. Vetco Inc.,*
 691 F.2d 1281 (9th Cir. 1981) .......................................................... 18

## DOCKETED CASES

*Agrama v. IRS,*
 No. 16-cv-716 (D.D.C.) .................................................................... 13

*In re Harmony Gold USA, Inc.,*
 No. 06-cv-7663 (C.D. Cal.) ....................................................... *passim*

## FOREIGN CASES

*Chan Mei Yiu Paddy v. Secretary for Justice (No. 2),*
 [2012] 3 H.K.L.R.D. 65 (C.A.) .................................................... 7, 15

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. VI ................................................................................ 17

# TREATIES

Mutual Legal Assistance Treaty, Italy-U.S., May 3, 2006,
    T.I.A.S. No. 10-201.36 ........................................................16

Mutual Legal Assistance Treaty, E.U.-U.S., June 25, 2003,
    T.I.A.S. No. 10-201.1 .........................................................16

Mutual Legal Assistance Treaty, Ireland-U.S., Jan. 18, 2001,
    T.I.A.S. No. 13137..............................................................16

Convention for the Avoidance of Double Taxation with Respect to Taxes on
    Income and the Prevention of Fraud or Fiscal Evasion, Italy-U.S., Aug. 25,
    1999,
    T.I.A.S. No. 09-1216 ..........................................................21

Agreement Concerning Mutual Legal Assistance in Criminal Matters, Italy-Hong
    Kong, Oct. 28, 1998.............................................................15

Agreement That Completes the European Convention on Mutual Assistance in
    Criminal Matters, Italy-Switzerland, Sept. 10, 1998.........................16

Mutual Legal Assistance Treaty, Hong Kong-U.S., Apr. 15, 1997,
    T.I.A.S. No. 00-121 ...........................................................16

European Convention on Mutual Assistance in Criminal Matters, Apr. 20, 1959,
    E.T.S. No. 030.................................................................15

# OTHER AUTHORITIES

Delegation Order 4-12 (Rev. 3) (Sept. 7, 2016)....................................22

Internal Revenue Manual
    § 4.60.1.2....................................................................23
    § 4.60.1.3....................................................................23

Restatement (Third) of Foreign Relations Law (1987).............................18

Ireland, Criminal Justice (Mutual Assistance) Act 2008 .........................15

Frank Agrama hereby responds to the Court's order to show cause why he should not be compelled to heed the Internal Revenue Service's summons. While often the enforcement of an IRS summons is routine, it is not always so, and this case proves why.  To enforce its summons the IRS must satisfy four factors defined in Supreme Court precedent (the "*Powell* factors").  In this case, the IRS fails to do so and its summons should be quashed.  Alternatively, Mr. Agrama respectfully submits that the Court should hold an evidentiary hearing to determine whether the enforcement of the summons is appropriate.  At the very least, Mr. Agrama presents specific facts and circumstances that plausibly raise an inference of the IRS's bad faith, thereby warranting the evidentiary hearing that the law provides.

Bad faith is, regrettably, the foundation of this case.  The summons and the tax investigation it serves arise from the government's inexplicable and unconscionable work in tandem with an Italian prosecutor's actions in violation of the U.S. Constitution, a U.S. treaty, at least three treaties between other countries (Hong Kong-Italy, Ireland-Italy and Switzerland-Italy) and the laws and sovereignty of four foreign countries (Hong Kong, Ireland, Switzerland and Italy), which expressly prohibit disclosure of the summoned documents.

Careful scrutiny is therefore warranted to ensure that the Court's process is not abused again, as it was in 2006, so that Mr. Agrama is not subjected to yet another improper government proceeding.

## INTRODUCTION

For nearly two decades, Frank Agrama has been relentlessly pursued by Fabio De Pasquale, an Italian prosecutor on a quest to punish business associates of former Italian Prime Minister Silvio Berlusconi, including Mr. Agrama.  Acting at De Pasquale's behest and based on his misrepresentations, U.S. agents in 2006 conducted an unlawful raid of Mr. Agrama's home and office—a raid in which De Pasquale and Gabriella Chersicla, a forensic accountant who would

serve as the Italian prosecution's expert witness, personally participated and unlawfully reviewed privileged documents. Once the U.S. government acknowledged De Pasquale's misrepresentations and its own complicity, this Court rebuked De Pasquale and ordered the U.S. government to return to Mr. Agrama the documents it had seized. Undeterred, De Pasquale barreled forward and used authorities in Hong Kong, Ireland, and Switzerland in his quest to obtain evidence about Mr. Agrama. Pursuant to one such request, De Pasquale and Chersicla participated in the searches of the homes and office of persons in Hong Kong whom Mr. Agrama represented and, as they had in the U.S. raid, again accessed privileged material in their quest to obtain the same documents that this Court had ordered the U.S. Government to return to Mr. Agrama. In fact, as the Hong Kong courts found, the Italian prosecutors "had, in the course of inspecting the documents, also been making notes and photocopies of documents," almost one hundred of which were subject to attorney-client privilege. Declaration of Roberto Pisano ("Pisano 2020 Decl.") ¶ 6.

The summons before the Court arises from those abuses and subsequent violations of the treaties and foreign laws under which the Italian prosecution team obtained information from other countries. Relying on documents that the Italian prosecution team obtained from Hong Kong and other countries, and on privileged information they accessed during their searches in the United States and Hong Kong, De Pasquale and Chersicla prepared an expert report purporting to analyze the financial relationship between Mr. Agrama and the parties whom he represented in Hong Kong (the "Chersicla Report"). The treaties and foreign laws under which those documents were provided to the Italian prosecution team strictly prohibit the Italian government from disclosing them for any purpose other than the purpose for which they were originally requested by the Italian prosecutor, namely, the criminal prosecution of Mr. Agrama in Italy. Consequently, the Italian government was prohibited from disclosing them to the

IRS.  Nonetheless, in violation of those treaties and foreign laws, and in violation of a U.S. treaty, the Chersicla Report and other documents were then provided to the IRS, apparently spurring the investigation that the summons at issue here seeks to aid.

Under the Supreme Court precedent, an IRS summons should be quashed if it seeks documents already in the IRS's possession or otherwise is in bad faith or would abuse the court's process.  The summons issued to Mr. Agrama should be quashed on multiple grounds.  First, it plainly seeks documents already in the IRS's possession.  Indeed, the IRS has admitted that it already has over 16,600 documents responsive to the summons from sources other than Mr. Agrama (the IRS has refused to disclose the exact number of such documents or any other information about them).  Second, the summons is an attempt to circumvent the disclosure prohibitions in the foreign treaties and laws under which the Italian prosecution team obtained documents.  The IRS has already obtained the Chersicla Report and other documents from Italian officials in violation of those international treaties and foreign laws. The IRS should not be permitted to evade those prohibitions a second time, by demanding from Mr. Agrama through the summons the same documents it already possesses unlawfully covered by those prohibitions.[1]  Third, the summons should be quashed because its enforcement would further a violation of the U.S. Constitution and also a violation of a treaty between the United States and Italy.  The investigation for which the IRS issued the summons is founded on the Chersicla Report, which is the product of the United States's violation of Mr. Agrama's constitutional rights, and which was

_____

[1] Mr. Agrama's Italian counsel received such documents in discovery in order to defend Mr. Agrama in what ultimately became a failed criminal prosecution in Italy, because in July 2016 Mr. Agrama was finally acquitted from all charges in the relevant Italian criminal proceeding (the so-called Mediatrade proceeding, no. 40382/05 RGNR) for which the documents were requested by and transmitted to the Italian prosecutor.

provided to the IRS in violation of a treaty between the United States and Italy. In sum, the enforcement of the summons would continue and compound this long train of violations of U.S. and foreign law, and of abuses against Mr. Agrama, in which the IRS appears to have participated. The Court should refuse to do so.

At the very least, the Court should hold an evidentiary hearing to determine whether the summons is valid and not in bad faith. Such a hearing would appropriately address numerous questions, including:

- the extent to which the IRS already possesses the summoned documents;

- the extent to which the current focus of the investigation is based on documents or information reviewed by the Italian prosecution team during the illegal searches of Mr. Agrama's home and business in California;

- the procedure by which the IRS obtained documents from the Italian prosecution team or other Italian governmental officials; and

- the extent to which the current focus of the investigation is based on documents the IRS received directly or indirectly from the Italian government or the Italian prosecution team.

Mr. Agrama respectfully submits that the petition should be denied, the summons should not be enforced, or—at the very least—the Court should order an evidentiary hearing in this matter.

## STATEMENT OF FACTS

### A.    The Unlawful Searches of Mr. Agrama's Home and Office by an Italian Prosecution Team

Frank Agrama is a Los Angeles-based entertainment executive who has for decades helped produce films and television series around the world. In the mid-2000s, Mr. Agrama and his company, Harmony Gold USA, Inc., became targets of Fabio De Pasquale, an Italian prosecutor who was investigating Prime Minister Silvio Berlusconi and whose investigation ultimately swept in many of

Berlusconi's business associates, including Mr. Agrama.  That pursuit continues to this day, despite Mr. Agrama's full acquittal in 2016.  Pisano 2020 Decl. ¶ 3.

As the Court is aware, in the fall of 2006, De Pasquale obtained a warrant pursuant to the United States-Italy Mutual Legal Assistance Treaty to search Mr. Agrama's home and office in Los Angeles.  Order Granting Mot. for Return of Prop. ("Return Order") at 1, No. 06-7663 (Jan. 26, 2007), ECF No. 37-3.  The search was conducted in ways that flagrantly violated U.S. law.

De Pasquale and other members of the prosecution team—including Chersicla, the forensic accountant who served as the prosecutor's expert witness—personally participated in the searches.  Return Order at 1; Gov't's Notice Regarding Its Response to Mot. for Return of Prop. ("Gov't Return Notice") at 2, No. 06-7663 (Jan. 22, 2007), ECF No. 37-8; *id.*, Ex. A, at 1.  During the searches, De Pasquale and Chersicla walked freely and unsupervised throughout Mr. Agrama's home and office, including in areas containing sensitive and privileged attorney-client communications and other privileged materials prepared by Mr. Agrama's legal team for his then-imminent trial.  Return Order at 1-2; Gov't Return Notice at 2; Declaration of Jehan Agrama ¶ 8, No. 06-7663 (Nov. 30, 2006), ECF No. 4 (Ex. A).[2]  De Pasquale and Chersicla viewed these materials and the FBI seized them at De Pasquale's direction.  Return Order at 1-2; Gov't Notice re Return at 2; *id.*, Ex. A, at 1.

Mr. Agrama moved under Federal Rule of Civil Procedure 41(g) for the return of the seized property.  *See* Mot. for Return of Unlawfully Seized Prop., No. 06-7663 (Dec. 1, 2006), ECF No. 1 (Ex. B).  Although the government initially defended the searches and the Italian prosecution team's participation in them, the government eventually confessed to the Court that the Italian prosecution team had indeed accessed Mr. Agrama's privileged materials, Gov't

---

[2] Except where otherwise noted, "Ex." citations refer to exhibits to the Declaration of Alejandro N. Mayorkas.

Return Notice at 2; Return Order at 2, and withdrew its opposition to Mr. Agrama's motion for the return of the seized property, assuring the Court that "[n]o materials seized during those searches, or copies thereof, will be transmitted to Italy," Gov't's Notice of Withdrawal of its Opp'n at 1-2, No. 06-7663 (Jan. 23, 2007), ECF No. 37-9; *see also* Mem. ISO Mot. to Enforce at 3-7, No. 06-7663 (Sept. 26, 2019), ECF No. 37-1.

The Court granted Mr. Agrama's motion, calling the Italian prosecution team's conduct "unlawful and reprehensible." Return Order at 1. The Court accordingly ordered that the government "shall not transmit to Italy or otherwise provide to [De Pasquale] or his prosecution team, or to any third party, any item of property seized from Frank Agrama's residence or … office, or any copy of same." Return Order at 3.

**B.    The Italian Prosecution Team Obtains Documents from Hong Kong and Ireland Pursuant to Mutual Legal Assistance Treaties**

Although De Pasquale failed to obtain the documents he needed from the United States, he conducted similar raids on persons whom Mr. Agrama represented in other countries with the aid of local authorities. He submitted requests for assistance to the governments of Hong Kong, Ireland, and Switzerland pursuant to Mutual Legal Assistance Treaties ("MLATs") between Italy and those countries. Declaration of James Pack ("Pack Decl.") ¶ 39 (Oct. 24, 2019), ECF No. 1-2; Declaration of Roberto Pisano ("Pisano 2019 Decl.") ¶ 5, No. 06-7663 (June 27, 2019), ECF No. 37-11; Pisano 2020 Decl. ¶¶ 5-15; Steven Kwan, "Collateral Use of Documents Seized and Transmitted under Letter of Request dated 10 July 2006" ("Kwan Legal Op.") ¶¶ 7-9, 25-27 (May 10, 2016) (Ex. C); Roberto Pisano, "Legal Opinion" ("Pisano Legal Op.") ¶ 3 (May 5, 2016) (Ex. D). In execution of one of these MLAT requests, the Hong Kong home and business premises of Chan Mei Yiu Paddy (a.k.a. Paddy Chan) was searched. As with the FBI searches, De Pasquale and Chersicla personally

1   participated in, and unlawfully accessed privileged materials during, those Hong

2   Kong searches. *Chan Mei Yiu Paddy v. Secretary for Justice (No. 2)*, ¶¶ 15-16,

3   19, 22-24, 112 [2012] 3 H.K.L.R.D. 65 (C.A.) (Ex. E); Pisano 2020 Decl. ¶¶ 5-6.

4   The MLATs and local laws under which the Italian prosecution team obtained

5   documents from foreign countries ("MLAT Documents") permitted their use

6   only in the Italian prosecution of Mr. Agrama for which they were requested but

7   barred their disclosure for any other purpose. *See infra* pp. 14-16.

8       The MLAT Documents have been a cornerstone of De Pasquale's pursuit

9   of Mr. Agrama. Some of the MLAT Documents were used as evidence in a

10  criminal trial of Mr. Agrama in Italy. Pisano 2020 Decl. ¶ 16. Some formed the

11  basis for the Chersicla Report, which was prepared for that trial. *Id*. ¶ 17.[3] And

12  consistent with the disclosure restrictions under the MLATs and foreign law, and

13  as required by Italian law, the MLAT Documents were also provided to Mr.

14  Agrama by the Italian prosecution team for him to defend himself. *Id*. ¶ 18.

## C. The IRS Initiates an Investigation of Mr. Agrama on the Basis of the MLAT Documents

17      Although the MLATs prohibited disclosure of the MLAT Documents for

18  any purpose other than for the Italian criminal prosecution of Mr. Agrama, the

19  IRS obtained a copy of the Chersicla Report and other MLAT Documents. Pack

20  Decl. ¶ 10; Declaration of Dennis L. Perez ("Perez 2019 Decl.") ¶ 11, No. 06-

21  7663 (June 27, 2019), ECF No. 37-12. On December 17, 2013—roughly one

22  week after the Chersicla Report was issued, Pack Decl. ¶ 10—the Internal

23  Revenue Service initiated an audit of Mr. Agrama (and his wife). Perez 2019

---

25      [3] Specifically, the Chersicla Report states: "The content of this report is

26  based essentially on the analysis of the documentation acquired through
    international letter of request transmitted by the Hong Kong authorities and

27  provided to this expert by [De Pasquale's] Office. That is the documentation
    seized at the premises" of persons in Hong Kong represented by Mr. Agrama

28  pursuant to the MLAT request. Pisano 2020 Decl. ¶ 17.

Decl. ¶ 7.  Three days later, the IRS issued the first Information Document

Request ("IDR") to Mr. Agrama relating to the audit.  Declaration of Dennis L.

Perez ("Perez 2020 Decl.") ¶ 5.  The investigation expanded from there: in May

2014, the IRS issued an audit letter to Harmony Gold for the years 2002-2009,

*id.* ¶ 6; then between August 2014 and October 2015, the IRS issued audit letters

to Mr. Agrama for all the years covered by the current tax investigation: 1997-

2009 and 2011, *id.* ¶ 7.

Since 2013, Mr. Agrama has cooperated extensively with the IRS.  He has

complied with multiple document requests and has turned over tens of thousands

of documents over the past seven years.  Perez 2020 Decl. ¶¶ 7-8.  IRS agents

have formally and extensively interviewed three current and former employees

of Harmony Gold.  *Id.* ¶ 8.  In 2016, the IRS issued penalty contribution letters to

Mr. Agrama and his daughter (even though she was not being audited) for failing

to file IRS Form 5471 regarding certain foreign corporations in which the IRS

alleges they had ownership interests.  Perez 2019 Decl. ¶¶ 9-11; Perez 2020

Decl. ¶ 9.[4]  But the IRS has continued to investigate Mr. Agrama.

On July 19, 2016, Mr. Perez and Christopher S. Rizek, both counsel for

Mr. Agrama, met with IRS group manager Steve Lepore, IRS agents James Pack,

Bernard Trapp, and David Jew, and IRS attorney Carolyn Schenck.  At this

meeting Mr. Perez and Mr. Rizek submitted to the IRS a memorandum prepared

by the law firm Caplin & Drysdale ("Caplin & Drysdale Mem.") (Ex. F).

Among the points addressed by the Caplin & Drysdale Memorandum are how

the IRS acquired the Chersicla Report and the violation of the various MLATs:

"The Agramas' counsel has asked the IRS how it acquired the Chersicla Report;

---

[4] The inclusion of Mr. Agrama's daughter, Jehan Agrama, in the Form
5471 penalty proceeding was shocking; she had not been the subject of the audit
that had been underway for two years.  Mr. Agrama's counsel promptly reached
out to the IRS to inquire and, in response, the IRS admitted that the Chersicla
report triggered that action.  Perez 2019 Decl. ¶¶ 9-11.

the IRS has stated that it received this information 'through channels' or through its 'attache.'  The Agramas suspect that the IRS either requested the Report, or it was voluntar[il]y provided to the IRS by the Italian Criminal Prosecutor or his office.  In any event, the IRS is apparently using the Report in blatant violation of the Italy-Hong Kong MLAT and the explicit order of the Hong Kong courts."  Caplin & Drysdale Mem. 5.

"[I]n furtherance of the examination," in 2018 the IRS issued the summons before the Court.  Pack Decl. ¶ 5.  The summons seeks:

- "[a]ll documents and recordings related to" the two Italian trials of Mr. Agrama.  *Id*., Ex. A ("Summons Attachment") at 1, ECF No. 1-3;

- "[a]ll documents related to" the lawsuit in which Agrama challenged the Italian prosecutors' MLAT request to Ireland.  *Id*.; *see* Pack Decl. ¶ 40;

- "[a]ll documents provided to the Italian government from other countries relating to the Italian trials where Frank Agrama was a named party … [,] includ[ing] documents provided from … Hong Kong, Ireland, or any other country."  Summons Attachment at 1.

In response to the summons, Mr. Agrama's Irish counsel produced all documentation it had filed with the Irish courts on behalf of Mr. Agrama during more than seven years of Irish proceedings in which counsel was defending Mr. Agrama's interests.  Mr. Agrama's Irish counsel, however, did not produce any MLAT Documents—documentation obtained by the Italian prosecution team from foreign jurisdictions under the pertinent MLATs.

Similarly, Mr. Agrama's Italian counsel responded to the summons by producing all documentation it had filed with the Italian courts in Milan and Rome (1st Instance, Appellate, and Supreme Court) on behalf of Mr. Agrama during more than eleven years of proceedings in which counsel was defending Mr. Agrama's interests.  Again, however, Mr. Agrama's Italian counsel did not

1    produce any MLAT Documents—documentation obtained by the Italian

2    prosecution team from foreign jurisdictions under the pertinent MLATs.  Pisano

3    2020 Decl. ¶ 19.

4          In essence, therefore, Mr. Agrama has not produced to the IRS responsive

5    MLAT Documents whose disclosure to the IRS was expressly prohibited by the

6    treaties and laws of Hong Kong, Ireland, Switzerland, and Italy.

7          In October 2019, the IRS filed this enforcement action, and in April 2020,

8    the Court ordered Mr. Agrama to show cause why the summons should not be

9    enforced.  Order, ECF No. 14 (Apr. 20, 2020).

10                                **ARGUMENT**

11   **I.    THE STANDARDS GOVERNING JUDICIAL ENFORCEMENT OF AN IRS**
12         **SUMMONS**

13         A court may enforce a summons issued under § 7602 only if the IRS has

14   "'demonstrate[d] good faith in issuing the summons.'"  *United States v. Clarke*,

15   573 U.S. 248, 250 (2014).  "More specifically, that means establishing what have

16   become known as the *Powell* factors: '[1] that the investigation will be

17   conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant

18   to the purpose, [3] that the information sought is not already within the IRS's

19   possession, and [4] that the administrative steps required by the Internal Revenue

20   Code have been followed.'"  *Id.* (quoting *United States v. Powell*, 379 U.S. 48,

21   57-58 (1964)) (quotation cleaned); *see also United States v. Richey*, 632 F.3d

22   559, 564 (9th Cir. 2011).

23         A summons should be quashed if the taxpayer rebuts the IRS's prima facie

24   case or otherwise shows the summons to be in "bad faith" or an "attempt[] to

25   abuse the court's process."  *United States v. Stuart*, 489 U.S. 353, 360 (1989);

26   *see Clarke*, 573 U.S. at 249, 254; *United States v. Michaud*, 907 F.2d 750, 758

27   (7th Cir. 1990).  Bad faith or an abuse of process exists if the IRS summons was

28   "'issued for an improper purpose, such as to harass the taxpayer or to put

pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'" *Stuart*, 489 U.S. at 359-360; *see also Richey*, 632 F.3d at 564.  This list of abuses is not exclusive.  "The *Powell* elements were not intended as an exclusive statement about the meaning of good faith. … The dispositive question in each case … is whether the Service is pursuing the authorized purposes in good faith." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 317 n.19 (1978); *see Crystal v. United States*, 172 F.3d 1141, 1144-1145 (9th Cir. 1999).  Thus, the taxpayer may "urge the court to quash the summons on any appropriate ground," *Clarke*, 573 U.S. at 250 (quotation cleaned), and "[f]uture cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process," *LaSalle*, 437 U.S. at 318 n.20.

"[T]he taxpayer is entitled to examine an IRS agent [at a hearing] when [the taxpayer] can point to specific facts or circumstances plausibly raising an inference of bad faith." *Clarke*, 573 U.S. at 254.  Although "[n]aked allegations of improper purpose are not enough," "circumstantial evidence can suffice to meet that burden; after all, direct evidence of another person's bad faith, at this threshold stage, will rarely if ever be available." *Id.*  Nor "is a fleshed out case demanded:  The taxpayer need only make a showing of facts that give rise to a plausible inference of improper motive." *Id.*; *see also United States v. Tanoue*, 94 F.3d 1342, 1345-1346 (9th Cir. 1996) (If "the party provide[s] specific facts and evidence …. to raise sufficient doubt about the government's motive for issuing the summons, the district court must hold a limited evidentiary hearing to determine whether further inquiry into the Service's purposes by way of discovery is warranted." (quotation cleaned)); *Fortney v. United States*, 59 F.3d 117, 121 (9th Cir. 1995) ("A taxpayer is not entitled to an evidentiary hearing unless he or she presents some minimal amount of evidence to support a

contention of a lack of good faith." (quotation cleaned)).[5]

If the hearing does not resolve the relevant factual questions, the taxpayer is entitled to additional discovery. *See, e.g.*, *United States v. Stuckey*, 646 F.2d 1369, 1374 (9th Cir. 1981) ("If taxpayer's allegations are sufficient, a limited evidentiary hearing is conducted.  Discovery is then warranted if the trial court is not convinced that the summonses were issued for a proper purpose.").

## II.  THE SUMMONS IS IN BAD FAITH BECAUSE IT SEEKS DOCUMENTS ALREADY POSSESSED BY THE IRS

The summons should be quashed because it seeks documents already possessed by the IRS.  At a minimum, however, a hearing should be held to determine the extent to which the IRS already possesses the summoned documents.

A.    The IRS's petition to enforce the summons is self-defeating. Although the IRS states that the materials "demanded in the summons are not already in the possession of the IRS," Pack Decl. ¶ 9; *see also* Mem. ISO Pet. to Enforce IRS Summons ("IRS Memo") at 2, ECF No. 1-1 ("the IRS does not already possess the material sought in the summons"), that statement is false, and it is even contradicted—repeatedly—by the IRS's own statements to this Court. For example, the IRS admits that it "has come into possession of copies of certain documents that are demanded in the summons."  Pack Decl. ¶ 10; *see also* Pack Decl. ¶¶ 4, 8-9; IRS Memo at 8 (acknowledging that IRS "has obtained some documents from the Agramas and possesses copies of some other summoned documents"); Perez 2019 Decl. ¶ 11.  Indeed, the IRS's vague admission grossly understates the volume of summoned documents it very likely

---

[5] The IRS states that to obtain a hearing, the taxpayer must "demonstrate specific and substantial facts showing that a genuine issue exists as to any material defect in the summons process."  IRS Memo at 3-4.  As the passages quoted above show, that is not the standard.  Notably, the IRS cites no authority for its articulation of the standard.

possesses. The IRS has collected more than 16,600 documents relating to Mr. Agrama's tax liability from sources other than Mr. Agrama, Declaration of Christopher R. Valvardi ("Valvardi Decl.") ¶ 11, *Agrama v. IRS*, No. 16-cv-716 (D.D.C. Feb. 10, 2017), ECF No. 12-4, at least some of which it "received from a foreign government(s)." Mem. ISO Mot. for Summ. J. at 6, 12-13, *Agrama*, No. 16-cv-716 (D.D.C. Feb. 10, 2017), ECF No. 12; *see* Valvardi Decl. ¶ 19.[6]

These facts alone suffice to quash the summons. But at a minimum, they raise a plausible inference that the IRS already possesses many of the summoned documents and therefore justify a hearing to determine more precisely what the IRS already possesses.[7]

B.     Citing *Action Recycling Inc. v. United States*, 721 F.3d 1142 (9th Cir. 2013), and out-of-circuit cases, the IRS insists that its possession of summoned documents is "not dispositive" of the third *Powell* factor because "[c]ourts" have taken "a practical approach to IRS accessibility." IRS Memo at 8 (quotation cleaned). The IRS's argument is wrong and would nullify this *Powell* factor. Consistent with the plain language of *Powell*, the Ninth Circuit in *Action Recycling* actually made clear that the IRS cannot use its summons power to obtain records from a taxpayer when it already possesses copies of those documents. 721 F.3d at 1146.

_____

[6] As noted, Mr. Agrama has already provided tens of thousands of documents to the IRS. *Supra* p. 8. "To the extent [those] documents … would also be responsive to a summons request, the IRS is not seeking [their] production …." Pack Decl. ¶ 9.

[7] The IRS requests that, in the event of a hearing, it be permitted to "present additional information in camera." Pet. to Enforce IRS Summons at 3-4, ECF No. 1. There is no place in a summons enforcement case for an in camera submission where the IRS's possession of documents is highly suspect. Mr. Agrama's counsel requires sufficient advance access to any such additional information that the IRS might submit to be able to adequately prepare for and examine the government witness at the hearing.

Moreover, whatever "flexibility" *Action Recycling* might permit in applying the "not already possessed" test, no flexibility is warranted here.  There, the court found that the "not already possessed" factor was met because, although the IRS previously had the records, by the time of the summons it no longer did.  721 F.3d at 1146.  The IRS does not claim the circumstances here are similar at all.  Instead, the IRS asserts that the Court should ignore the fact that the IRS already possesses summoned documents solely because—the IRS says—the summoned documents "may be relevant" to its investigation.  Relevance, however, is a *separate Powell* factor.  *Powell*, 379 U.S. at 57-58.  If relevance were a proper basis to find the "not already possessed" factor met, then that factor would be pointless.

III.   **THE SUMMONS IS IN BAD FAITH BECAUSE IT SEEKS TO CIRCUMVENT INTERNATIONAL LEGAL RESTRICTIONS ON THE DISCLOSURE OF THE SUMMONED DOCUMENTS**

The summons should be quashed because judicial enforcement would involve the Court in the IRS's effort to circumvent international legal restrictions on the disclosure of the summoned documents.

A.   The summons demands documents whose disclosure is prohibited by the laws and sovereignty of Hong Kong, Ireland, Switzerland and Italy, and by the mentioned international treaties between those countries. The summons seeks "[a]ll documents provided to the Italian government from other countries relating to the Italian trials where Frank Agrama was a named party … [,] includ[ing] documents provided from Switzerland, … Hong Kong[ and] Ireland."  Summons Attachment at 1.  And insofar as the summons seeks documents "related to" the Italian criminal trials, it covers documents that were created from the contents of documents provided to the Italian government by foreign governments, such as the Chersicla Report, *see supra* p. 7 & n.3.  These are the MLAT Documents, i.e., the documents provided to the Italian prosecution team by foreign

governments pursuant to requests made under MLATs solely for the purpose being used in the Italian prosecution of Mr. Agrama and subject to the express prohibition that they not be disclosed or used for any other purpose. *Chan Mei Yiu Paddy*, *supra*, ¶¶ 6-11; Pisano 2020 Decl. ¶¶ 5-15; Kwan Legal Op. ¶¶ 7-9, 25-27; Pisano Legal Op. ¶ 3.

The Italy-Hong Kong MLAT prohibits the Italian government from "disclos[ing] or us[ing] information or evidence furnished for purposes other than those stated in the request without prior consent of the Central Authority of the Requested Party," Agreement between the Government of the Hong Kong Special Administrative Region of the People's Republic of China and the Government of the Italian Republic Concerning Mutual Legal Assistance in Criminal Matters art. VII(2), Italy-Hong Kong, Oct. 28, 1998[8]; *see also id.* art. I(3) (prohibiting assistance "in connection with non-criminal proceedings relating" to taxation); Kwan Legal Op. ¶¶ 20-24; Pisano Legal Op. ¶ 4.2. The MLAT between Italy and Ireland states that requests for criminal assistance are to be "execute[d] in the manner provided for by [the requested country's] law." European Convention on Mutual Assistance in Criminal Matters art. 3.1, Apr. 20, 1959.[9] Irish law in turn permits evidence to be provided to a foreign government only if the requesting government gives "assurance" that "any evidence" supplied in response will not "be used for any purpose other than that permitted by the relevant international instrument or specified in the request," absent "prior consent" from the appropriate Irish authority. Ireland, Criminal

---

[8] *Available at* https://www.elegislation.gov.hk/hk/cap525G!en. The Hong Kong Justice Secretary has stated in an affidavit on May 27, 2013, that no consent was given to disclose the transmitted information. *See* Kwan Legal Op. ¶ 7.

[9] *Available at* https://rm.coe.int/CoERMPublicCommonSearchServices/ DisplayDCTMContent?documentId=09000016800656ce.

Justice (Mutual Assistance) Act 2008, §§ 74(5), 75(6).[10]  Similarly, the MLAT between Italy and Switzerland prohibits disclosure or use of the MLAT documents for civil tax purposes.  Agreement Between Switzerland and Italy That Completes the European Convention on Mutual Assistance in Criminal Matters art. IV, Sept. 10, 1998.[11]  Therefore, these foreign treaties and associated laws of Italy, Hong Kong, Ireland, and Switzerland bar the Italian government from providing any MLAT Documents to the IRS, since the IRS obviously would not use them in furtherance of the Italian prosecution of Mr. Agrama. Kwan Legal Op. ¶¶ 14-17, 28-44; Pisano Legal Op. ¶¶ 4, 6.

B.     The summons is an attempt by the IRS to circumvent these legal prohibitions, after that the IRS has already illegally obtained the very same MLAT Documents in violation of these prohibitions (not to mention in violation of a treaty between the United States and Italy, discussed below).  If the IRS issued this summons to obtain "clean" versions of the MLAT Documents, that would only confirm the legal violations at the heart of its audit and reinforce that the summons was issued in bad faith and should be quashed.

Consistent with the principle of comity and given similar treaties between the United States and other countries,[12] U.S. courts respect international treaties

---

[10] *Available at* http://revisedacts.lawreform.ie/eli/2008/act/7/revised/en/pdf.

[11] *Available at* https://www.admin.ch/opc/it/classified-compilation/20030827/index.html.

[12] *See* United States-Hong Kong MLAT art. I(3) (prohibiting "assistance for non-criminal proceedings relating" to taxation), *available at* https://www.state.gov/wp-content/uploads/2019/02/00-121-Hong-Kong-Law-Enfmnt-MLAT.pdf; *id.* art. VII ("Limitations on Use"); United States-Italy MLAT art. 8 ("Protecting Confidentiality and Restricting Use of Evidence and Information"), *available at* https://www.state.gov/wp-content/uploads/2019/02/10-201.36-Italy-EU-Mutual-Legal-Assistance-Treaty.pdf; United States-Ireland MLAT art. 7 ("Limitations on Use"), *available at* https://www.state.gov/wp-content/uploads/2019/03/13137-Ireland-MLAT-01.18.2001.pdf; United States-

such as those that prohibit disclosure of the MLAT Documents to the IRS.  This respect mirrors the high status that U.S. treaties are accorded domestically: they are "the supreme Law of the Land."  U.S. Const. art. VI, cl. 2; *see Samann v. Commissioner of Internal Revenue*, 313 F.2d 461, 463 (4th Cir. 1963) ("The Convention as a treaty is, of course, 'the supreme Law of the Land.'").

For example, in *United States v. Stuart*, which concerned a document summons issued by the IRS at the request of the Canadian government under a treaty between the two countries, the Supreme Court emphasized the (sworn) statement by the IRS Director of Foreign Operations that the "'exchanged information may only be disclosed as required in the normal administrative or judicial process operative in the administration of the tax system of the requesting country,' and that improper use of exchanged information would be protested."  489 U.S. at 360.

Starting from the leading decision *Societe Internationale v. Rogers*, 357 U.S. 197 (1958), courts have maintained that non-compliance with a summons could be justified where disclosure was prohibited by the law of the country where the summoned documentation was located.  In *Ings v. Ferguson*, the Second Circuit held:  "Upon fundamental principles of international comity, our courts dedicated to the enforcement of our laws should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an unnecessary circumvention of its procedures."  282 F.2d 149, 152 (2d Cir. 1960).  Exactly the same principles were confirmed in *Application of Chase Manhattan Bank*, where the Second Circuit added: "The Government, as well as other litigants, has a real interest in civil and criminal cases in obtaining evidence wherever located.  However, we also have an obligation to respect the laws of

---

European Union MLAT art. 9 ("Limitations on use to protect personal and other data"), *available at* https://www.state.gov/wp-content/uploads/2019/02/10-201.1-European-Union-Mutual-Legal-Assistance-Treaty.pdf.

1    other sovereign states."  297 F.2d 611, 613 (2d Cir. 1962); *see also FTC v.*

2    *Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1327 (D.C. Cir.

3    1980).

4         In *United States v. Vetco Inc.*, the Ninth Circuit recognized: "Courts must

5    balance competing interests in determining whether foreign illegality ought to

6    preclude enforcement of an IRS summons.  The result in each case will turn on

7    the particular circumstances."  691 F.2d 1281, 1288 (9th Cir. 1981).  The

8    Restatement recognizes the same principle.  Restatement (Third) of Foreign

9    Relations Law § 442 (1987).  *Vetco* then identified a number of relevant factors

10   to be used for that purpose.  Consideration of those factors here leads to the

11   conclusion that the summons should not be enforced.

12        First, the disclosure of the summoned documents is prohibited not simply

13   by the law of a single State, but by the laws of at least four foreign countries

14   (Hong Kong, Ireland, Switzerland and Italy), and by the three international

15   treaties among those countries.  A ruling that would contravene the laws and

16   international agreements of so many countries would certainly show great

17   disrespect for those other countries, contrary to the fundamental principle of

18   comity expressed in *Ings* and other cases.  Furthermore, such a ruling could

19   damage the United States's vital interest in promoting international judicial

20   cooperation on criminal and tax matters.  *See* Restatement § 442 cmt. c ("In

21   making the necessary determination of the interests of the United States under

22   Subsection (1)(c), the court or agency should take into account not merely the

23   interest of the prosecuting or investigating agency in the particular case, but the

24   long-term interests of the United States generally in international cooperation in

25   law enforcement and judicial assistance, in joint approach to problems of

26   common concern, in giving effect to formal or informal international agreements,

27   and in orderly international relations.").

28

Second, there exists "alternative means" for the IRS "to obtain lawfully" the summoned MLAT Documents.  The IRS can issue requests directly to the governments of Hong Kong, Ireland, and Switzerland, on the basis of the applicable double-taxation treaties between the United States and those countries.

Third, Mr. Agrama has made his best good-faith efforts, before and after the summons, to produce all relevant documents sought by the IRS that were not subject to the disclosure prohibitions under foreign treaties and laws.

Finally, and above all, the law is clear that an IRS summons may enforced only if it was issued in good faith by the IRS.  In this case, however, the summons was issued, as clearly shown, in bad faith by the IRS, and it represents an attempt to abuse the court's process.  In particular, courts have indicated that a summons is in bad faith and an abuse of process if it is issued to obtain discovery that the IRS could not obtain directly.  *See, e.g.*, *United States v. Clarke*, 816 F.3d 1310, 1317 (11th Cir. 2016) ("[I]ssuing summons in bad faith for the sole purpose of circumventing tax court discovery would be an improper purpose as a matter of law." (citing *PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 219 (2d Cir. 1992))).

## IV.  THE SUMMONS IS IN BAD FAITH BECAUSE THE IRS'S INVESTIGATION IS FOUNDED ON DOCUMENTS IT OBTAINED UNLAWFULLY

The government's unlawful actions have "so taint[ed] the investigation that enforcement of the summons[] would amount to an abuse of the court's process."  *Gluck v. United States*, 771 F.2d 750, 756-757 (3d Cir. 1985).  At a minimum, the facts raise the plausible inference of such a taint and therefore warrant an evidentiary hearing.

A.   An IRS summons is in bad faith and should be quashed if it was "issued to assist an investigation that was [commenced or] intensified as the result of the information unconstitutionally obtained by the agent," such as

through an unconstitutional search or seizure.  *United States v. Beacon Fed. Sav. & Loan*, 718 F.2d 49, 53-55 (2d Cir. 1983); *see also Gluck*, 771 F.2d at 756-757; *United States v. Bank of Commerce*, 405 F.2d 931, 934-935 (3d Cir.1969).  "By granting enforcement to a summons that resulted from an unconstitutional search, [for example,] the court would be furthering the effects of, if not actually encouraging, unconstitutional conduct."  *Beacon*, 718 F.2d 49, 53-55.  For the same reason, a summons should be quashed if the investigation was commenced or intensified because of information obtained through a serious non-constitutional violation.  *See, e.g.*, *Gluck*, 771 F.2d at 756-757 (suggesting investigation based on information obtained in violation of Federal Rule of Criminal Procedure 6(e) would justify quash of summons).

B.     Here, the IRS's investigation of Mr. Agrama is tainted by its reliance on the Chersicla Report and other MLAT Documents.  The Chersicla Report, which purports to analyze the financial relationship between Mr. Agrama and persons in Hong Kong he represents, Pisano 2020 Decl. ¶ 17, is at the heart of the IRS's investigation as currently structured.  Contrary to the IRS's statement, the IRS actually initiated the audit to which the summons relates on December 17, 2013, Perez 2019 Decl. ¶ 7; Perez 2020 Decl. ¶ 4—about one week after the Chersicla Report issued, Pack Decl. ¶ 10.  The audit began with tax years 2008 and 2009 and has since expanded to cover 1997-2009 and 2011, as well as the alleged liability of Mr. Agrama's daughter Jehan.  *Supra* pp. 7-8.  And the IRS admits that it has the Chersicla Report and other MLAT Documents.  Pack Decl. ¶ 10; Perez 2019 Decl. ¶ 11.[13]  But the IRS's reliance on the Chersicla Report

_____

[13] As previously explained, *see* n.2, *supra*, the inclusion of Mr. Agrama's daughter Jehan in the new penalty proceeding was shocking because she had not been the subject of the audit that had been underway for two years.  In response to Mr. Agrama's counsel's prompt inquiry, the IRS admitted that the Chersicla report triggered her inclusion.  When the IRS first received the Chersicla report is therefore a critical evidentiary question that has yet to be answered (the fact

and other MLAT Documents—and thus the investigation for which the IRS issued the summons—stems from several serious legal violations.

First, as explained in greater detail in Mr. Agrama's motion to enforce the Court's order to return seized property, the FBI search of his residence and office, in which De Pasquale and Chersicla participated, violated Mr. Agrama's rights under the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution. Mem. ISO Mot. to Enforce at 16-19, ECF No. 37-1; Reply ISO Mot. to Enforce at 15-18, ECF No. 44.  The Chersicla Report is the fruit of that poisonous tree: De Pasquale and Chersicla improperly reviewed Mr. Agrama's files, including privileged materials, during the searches; they could not ignore what they had learned when they subsequently conducted their search of persons in Hong Kong represented by Mr. Agrama or when they prepared the Chersicla Report. *See United States v. Danielson*, 325 F.3d 1054, 1073 (9th Cir. 2003).

Second, there is solid reason to believe that the IRS obtained the Chersicla Report and the other MLAT Documents in violation of a U.S. treaty.  The United States and Italy have entered into a treaty that permits the two governments to "exchange such information as is necessary … for the prevention of fraud or fiscal evasion."  Convention for the Avoidance of Double Taxation with Respect to Taxes on Income and the Prevention of Fraud or Fiscal Evasion, Italy-U.S., art. 26.1, Aug. 25, 1999, T.I.A.S. No. 09-1216 ("United States-Italy Tax Treaty").[14]  The treaty requires that such exchanges be performed by the "competent authorities of the Contracting States," *id.*, i.e., the Secretary of the Treasury "or his delegate" and the Ministry of Finance, *id.*, art. 3.1(e).  The

---

that the IRS launched its audit of Mr. Agrama a few days after the Chersicla Report was issued suggests the IRS obtained the Chersicla Report as soon as it was issued, and this investigation resulted from it).

[14] *Available at* https://www.treasury.gov/resource-center/tax-policy/treaties/Documents/italy.pdf.

Secretary has designated the Commissioner for Large Business & International ("LB&I") and a few other senior officials "[t]o act as 'competent authority' … for all matters encompassed by the tax treaties."  Delegation Order 4-12, ¶¶ 1-7 (Rev. 3) (Sept. 7, 2016).[15]  And the Secretary has delegated to the Director of Treaty Administration and a few other officials the power "[t]o authorize the transmittal of, and request for, information in accordance with the exchange-of-information provisions of tax treaties."  *Id.* ¶¶ 17-19.

As discussed above, however, the treaties between Italy and Hong Kong, Ireland, Switzerland, as well as associated local laws, prohibit the government of Italy from providing the MLAT Documents, including the Chersicla Report, to the United States government.  *Supra* pp. 14-16.

In a conference call which took place on November 10, 2015, IRS agents Steve Lepore and Bernard Trapp informed Mr. Agrama's counsel Dennis Perez that they had received the Chersicla Report, and that this had come "through channels or through the US attaché."  Letter from Evan J. Davis to James Pack at 7, 10 (Dec. 13, 2018) (Ex. G); Caplin & Drysdale Mem. 5, 11.  The strong suspicion that the Chersicla Report, and potentially a significant number of the over 16,600 documents possessed by the IRS, appears to have been transmitted from the Italian prosecution team to the IRS via a U.S. attaché at the U.S. Embassy in Rome (it is unclear whether the attaché was the DOJ attaché or the IRS attaché), in violation of the applicable disclosure prohibitions, is further confirmed by the IRS, *see* Pack Decl. ¶¶ 10, 39, and by the correspondence between the Italian prosecutor and the DOJ, *see* Letter from Mary Ellen Warlow,

---

[15] *Available at* https://www.irs.gov/pub/foia/ig/spder/do_4_12_rev_3.pdf.

Dir., Office of Int'l Affairs, U.S. Department of Justice, to Fabio De Pasquale (Mar. 2, 2010) (Ex. H).[16]

In this case, therefore, it appears that the Chersicla Report was illegally obtained by the IRS: (i) outside the proper channel provided for by the United States-Italy Tax Treaty; (ii) by breaching the fundamental rule that the IRS is prohibited from exchanging information with foreign prosecuting authorities; and (iii) by breaching the disclosure prohibitions in the pertinent international treaties and foreign laws.  Consequently, it would appear that this obtaining of the Chersicla Report was a conscious violation undertaken to evade the applicable disclosure prohibitions; IRS agents are specifically trained and thus should know that "[a]ll exchanges of information under the provisions of international exchange agreements must be conducted through the U.S. Competent Authority," Internal Revenue Manual § 4.60.1.2(1); *cf. Gluck*, 771 F.2d at 756-758 (enforcing summons because "the IRS agents acted in good faith reliance on" a court order that was "facially valid" when issued, though subsequently rendered invalid).[17]

C.    The government has denied that the current tax investigation is based on the Chersicla Report.  Its denial is implausible.  The IRS asserts that Mr. Agrama's "2009 tax return was selected for examination" in 2011, more than two years before the Chersicla Report was issued.  Pack Decl. ¶ 17.  But at that time, the examination did not have in view any activity that may have occurred

---

[16] The U.S. State Department's website does not list a Treasury Department attaché.  U.S. Embassy & Consulates in Italy, *available at* https://it.usembassy.gov/embassy-consulates/rome/sections-offices/.  During the Agramas' FOIA suits, the IRS refused to search the files of the IRS's attaché in Italy, which once again raises the question as to where the IRS obtained these documents.  Perez 2020 Decl. ¶ 12.

[17] Agents are instructed that even the "spontaneous exchange of information" with a foreign government "must be conducted through the U.S. Competent Authority."  Internal Revenue Manual § 4.60.1.3(1).

in Italy or Hong Kong, which is now the focus of the investigation, as evidenced by the scope of the summons.  *See* Summons Attachment at 1; *supra* p. 9; Pack Decl. ¶¶ 25-38.  The IDR issued by the IRS to Mr. Agrama before the Chersicla Report was issued concerned Mr. Agrama's eligibility for the Offshore Voluntary Disclosure Program—an unrelated legal question.  Perez 2019 Decl. ¶¶ 3-6; Perez 2020 Decl. ¶ 5.

The IRS asserts that it turned its attention to Mr. Agrama's activity that was the subject of the Italian prosecutions in 2012—again, before the Chersicla Report was issued—after Mr. Agrama's own lawyer "told the IRS that he was working with a French attorney on a case" and that Mr. Agrama's "funds held at UBS were frozen."  Pack Decl. ¶ 18.  The IRS's assertion is false.  Contrary to the assertions of the IRS declarant—who was not even present during the conversation and had not even been assigned to Mr. Agrama's case yet—the statements Mr. Agrama's lawyer made to the IRS about working with a French lawyer and frozen assets at UBS were not about Mr. Agrama; they were about a different client and a different case.  Perez 2020 Decl. ¶¶ 13-15.  In fact, Mr. Agrama's lawyer made no statement to the IRS suggesting that Mr. Agrama owned any of the assets that are now the focus of the investigation.  *Id.*

At most, the IRS's assertions establish that it was examining some aspect of Mr. Agrama's tax status in the United States before it obtained the Chersicla Report.  But as the IRS has conceded, *see* Perez 2019 Decl. ¶ 11, its investigation *today* is based on the Chersicla Report.  That is enough, standing alone, to quash the summons.

D.    In any event, if there is any doubt that the IRS relied on the Chersicla Report or any other MLAT Documents in commencing or even orienting this investigation, if there is any doubt that such documents are tainted by the FBI's unconstitutional search of Agrama's residence and office, or if there is any doubt that the IRS obtained such documents unlawfully, the Court should hold an

1    evidentiary hearing to resolve the doubt.  The record at this point contains ample

2    specific facts at least plausibly raising such inferences.  *Clarke*, 573 U.S. at 254.

3                                             **CONCLUSION**

4              For the foregoing reasons, Frank Agrama respectfully submits that the

5    IRS's summons should be quashed.  In the alternative, an evidentiary hearing

6    should be held.

7

8

9    Dated:  June 18, 2020              WILMER CUTLER PICKERING HALE &
                                        DORR LLP
10

11

12                                      By:    /s/ Alejandro N. Mayorkas
                                               Alejandro N. Mayorkas (SBN: 122447)
13                                             *Attorney for Respondent*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28