1

2

3     O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,     )   Case No. CV 19-09204 DDP (JCx)
                                    )
12                Petitioner,       )
                                    )   **ORDER DENYING RESPONDENT'S MOTION**
13        v.                        )   **FOR EVIDENTIARY HEARING**
                                    )
14   FRANK AGRAMA,                  )
                                    )   [Dkt 18, 23]
15                Respondent.       )
     _____ )

16

17        Presently before the court is Respondent Frank Agrama's Motion

18   for Evidentiary Hearing.[1]  Having considered the submissions of the

19   parties, the court denies the motion for evidentiary hearing and

20   adopts the following Order.

21   **I.   Background[2]**

22        In 2006, an Italian prosecutor sought, pursuant to a Treaty on

23   Mutual Legal Assistance in Criminal Matters ("MLAT") between Italy

24   and the United States, U.S. government assistance with an Italian

25   _____

26        [1] Although not styled as a motion to quash, Agrama also asks
     that this Court quash the IRS summons that the agency has
27   petitioned the court to enforce.

28        [2] The facts recited here are drawn from the filings in this
     matter, as well as those in a related matter, In Re Search of
     Harmony Gold USA Inc., No. 06-cv-07663-DDP-JC.

investigation of Respondent Frank Agrama ("Agrama").  Accordingly, FBI agents obtained and executed search warrants for Agrama's home and business in Los Angeles.  Italian authorities, including forensic accountant Gabriela Chersicla ("Chersicla") were present during the searches.

Soon after, Agrama asked this Court to order the FBI to return property and documents seized during the searches.  Agrama contended, among other things, that the affidavits underlying the search warrants were defective, that FBI agents failed to follow search protocols set forth in the warrants, and that many of the documents seized were privileged.  After initially opposing Agrama's motion for return of property, the government ultimately withdrew its opposition, acknowledged that agents had erred in certain respects, agreed that the search warrants should be withdrawn, and agreed to return all property, without transmitting or providing any copies of any documents to Italy or the Italian prosecutors.  This Court entered an order to that effect, with which the government complied.

In 2009, Agrama and his wife sought to participate in the Internal Revenue Service's voluntary disclosure program regarding foreign bank accounts.  As part of that process, the Agramas represented that they were not under criminal investigation by any law enforcement authority.  The IRS preliminarily and conditionally accepted the Agramas' voluntary disclosure and, on the basis of that disclosure, began a review of the Agramas' 2009 tax return.

In 2012, the IRS learned that Agrama was, in fact, under criminal indictment in Italy.  Indeed, Agrama was convicted of tax evasion later that year in Italy, and received a three-year

sentence.  The Agramas were subsequently removed from the IRS'
voluntary disclosure program in early 2013.

In the meantime, and indeed even prior to the 2006 MLAT
request to the United States, Italian prosecutors also sought
assistance from the governments of Switzerland, Hong Kong and
Ireland pursuant to MLATs between Italy and each of those foreign
entities.  As with the FBI searches in the United States, Italian
forensic accountant Chersicla was present during searches executed
in Hong Kong in 2007.  Italian prosecutors were eventually able to
obtain, over Agrama's objections, documents from all three other
jurisdictions (the "MLAT documents").  In December 2013, Chersicla
authored a report analyzing documents obtained from Hong Kong ("the
Chersicla Report").  The Chersicla Report and all MLAT documents
were, consistent with all applicable treaties and laws, provided to
Agrama in the course of criminal proceedings against him in Italy.[3]

At some point after the Agramas' expulsion from the IRS'
voluntary disclosure program in early 2013, and after the
publication of the Chersicla report in December 2013, the IRS
initiated an audit of the Agramas and, eventually, Agrama's
business.  The IRS is currently investigating the Agramas' tax
liability for fourteen tax years, ranging from 1997 to 2011.  In
connection with that examination, the IRS issued a summons in 2018
directing Agrama to produce documents, including all documents
related to Agrama's two criminal trials in Italy, documents related
to Agrama's challenge to Italy's MLAT request to Ireland, and all

---

[3] Although Agrama was convicted of tax evasion in Italy in
2012, he was later acquitted of further charges in 2016.

1   documents provided to the Italian government from other countries,

2   including Hong Kong, relating to Agrama's two trials in Italy

3   (i.e., the MLAT documents).  Although Agrama provided some

4   documents to the IRS, he has not provided any MLAT documents.

5   Accordingly, the IRS has petitioned this Court to enforce the

6   summons and require Agrama to produce the MLAT documents.

7      Agrama contends that the summons should be quashed because it

8   was issued in bad faith.  In the alternative, Agrama requests an

9   evidentiary hearing to determine whether the summons was issued for

10   a proper purpose.

11  **II.  Discussion**

12      To obtain judicial enforcement of a summons, the IRS need only

13   show that the summons was issued in good faith.  United States v.

14   Clarke, 573 U.S. 248, 250 (2014).  Indeed, this Court's inquiry is

15   limited to that narrow question.  Id. at 254.  The IRS meets its

16   burden by demonstrating that (1) the investigation has a legitimate

17   purpose, (2) the inquiry may be relevant to that purpose, (3) the

18   IRS does not already possess the information it seeks, and (4) the

19   IRS has followed the procedures required by the Internal Revenue

20   Code.  United States v. Powell, 379 U.S. 48, 57-58 (1964).  This

21   Court has already determined that the government has made such a

22   prima facie showing.  (Order to Show Cause, Dkt. 14.)  Although

23   summons enforcement proceedings are "summary in nature," a

24   respondent is nevertheless entitled to contest an IRS summons "on

25   any appropriate ground."  Clarke, 573 U.S. at 250, 254.  A taxpayer

26   seeking an evidentiary hearing "need only make a showing of facts

27   that give rise to a plausible inference of improper motive."  Id.

28

1  "Naked allegations of improper purpose[, however,] are not enough."

2  Id.

3       A.   Prior Possession

4       Agrama argues first that the summons in question was issued in

5  bad faith because the IRS already possesses the information it

6  seeks.  The IRS does not dispute that it already possesses portions

7  of some documents, such as the Chersicla Report, that fall within

8  the ambit of the summons.  The IRS represents, however, that it has

9  no way of knowing whether the documents it does possess are

10 complete.  And, in the case of the Chersicla Report, the IRS knows

11 that its copy is not complete, and that the full report includes

12 nearly 250 exhibits, none of which are attached to the IRS' copy.

13 Under these circumstances, this Court cannot agree that the IRS

14 improperly seeks information that is already in its possession.

15      Although Agrama asserts that "the Supreme Court's mandate is

16 clear" that this Court cannot enforce a summons that seeks any

17 information already possessed by the IRS, this Court does not read

18 Powell as dogmatically as Agrama would urge.  In Powell, the Court

19 agreed that a statutory mandate that "[n]o taxpayer shall be

20 subjected to unnecessary examination or investigations" "does

21 appear to require that the information sought is not already within

22 the [IRS]' possession."  26 U.S.C. § 7605(b); Powell, 379 U.S. at

23 56.  Nevertheless, the Court explained, the clause's "primary

24 purpose was no more than to emphasize the responsibility of agents

25 to exercise prudent judgment in wielding the extensive powers

26 granted to them by the Internal Revenue Code."  Powell, 379 U.S. at

27 56.  The Court further explained that an abuse of the judicial

28 enforcement process would occur "if the summons had been issued for

1  an improper purpose, <u>such as to harass the taxpayer</u> . . . ." <u>Id.</u>

2  at 58 (emphasis added).  The Ninth Circuit, discussing the third

3  <u>Powell</u> factor (i.e., the "already possesses" factor), has similarly

4  held that the "limitation prevents unnecessary summonses that are

5  designed to harass the taxpayer, or that otherwise abuse the

6  court's process." <u>Action Recycling Inc. v. United States</u>, 721 F.3d

7  1142, 1146 (9th Cir. 2013) (internal quotation marks omitted).

8  Notably, moreover, the Ninth Circuit interpreted the third <u>Powell</u>

9  factor to forbid a repeat summons to a taxpayer "[w]here the IRS

10  already possesses copies of particular records <u>obtained from the</u>

11  <u>taxpayer</u>." <u>Id.</u>  "This limitation was not designed, however, to

12  obstruct the ability of the IRS to obtain relevant information

13  necessary to a legitimate investigation." <u>Id.</u>

14       Here, Agrama does not contend that any of the information the

15  IRS seeks, but may already possess, has already been produced by

16  Agrama himself.  Nor, to the extent that the IRS does seek

17  information it already possesses, is there any indication that the

18  IRS' efforts are motivated by any intent to harass Agrama.  Rather,

19  as discussed above, the IRS seeks to complete partial documents in

20  its possession, or to determine whether documents in its possession

21  are, in fact, complete.  Under these circumstances, <u>Powell</u> cannot

22  be read to require that the summons be quashed.  <u>See</u> <u>Action</u>

23  <u>Recyling</u>, 721 F.3d at 1145-46 (interpreting <u>Powell</u> as "cautioning

24  against a stringent interpretation that could hamper the [IRS] in

25  carrying out investigations [it] thinks warranted, and noting that

26  the legislative history of § 7605(b) indicates that no severe

27  restriction was intended." (internal quotation marks omitted)).

28       B.   Circumvention of Treaties

1    The MLAT treaties between Italy and Hong Kong, Ireland, and
2  Switzerland restrict, to varying degrees, the requesting government
3  (in this case, Italy)'s use of any information provided by the MLAT
4  treaty partner.[4]  Agrama contends that the IRS' true purpose in
5  seeking MLAT documents from Agrama is to circumvent the various
6  MLATs' restrictions, and that this improper purpose merits quashal
7  of the summons.  This argument is not persuasive.  As an initial
8  matter, Agrama cites to a series of cases that are largely inapt.
9  With one exception, none concerns an IRS summons, and all involved
10  an attempt to obtain information located in foreign countries.  See
11  Societe Internationale v. Rogers, 357 U.S. 197 (1958) (Swiss bank
12  records); Ings v. Ferguson, 282 F.2d 149, 150 (2d Cir. 1960) (bank
13  records located in Canada); Application of Chase Manhattan Bank,
14  297 F.2d 611, 611 (2d Cir. 1962) (bank records located in Panama).

15    Furthermore, and more fundamentally, Agrama provides no
16  explanation how an IRS summons to a private United States citizen
17  in the United States could possibly implicate any obligations the
18  government of Italy may owe to any other foreign entity.  United
19  States v. Vetco Inc., 691 F.2d 1281, 1288 (9th Cir. 1981), is of
20  little aid to Agrama.  In Vetco, the IRS sought records that were
21  not only located in Switzerland, but the divulgence of which might
22  also subject the U.S. respondents to criminal penalties in
23  Switzerland.  The Ninth Circuit applied a five-factor test "in
24  determining whether foreign illegality ought to preclude
25  enforcement of an IRS summons," and concluded that, under the

---

27    [4] Although Agrama represents, and the government does not
28  dispute, that this is true of the MLAT treaty between Italy and
   Switzerland, Agrama does not provide a reference to an English-
   language version of the relevant treaty.

7

circumstances present in <u>Vetco</u>, the national interests at stake, the hardship to respondents, the location of production, the importance of the records, and the availability of alternate means of compliance weighed in favor of enforcing the summons, notwithstanding the possibility of criminal prosecution in Switzerland.  <u>Vetco</u>, 691 F.2d at 1288-90.  Here, although a weighing of the relevant considerations would yield a similar conclusion, the court need not consider each of the five <u>Vetco</u> factors because Agrama has not made a threshold showing that his compliance with the summons would violate any foreign law.  <u>See</u> <u>Vetco</u>,691 F.2d at 1289 ("The party relying on foreign law has the burden of showing that such law bars production.").  Put simply, no MLAT between Italy and any other entity puts any restriction on Agrama's ability to produce documents in his possession or control.[5]

C.    Tainted Investigation

Illegal, and particularly unconstitutional, conduct by IRS agents may so compromise the good faith of an investigation as to render any judicial enforcement of a related summons an abuse of judicial process.  <u>United States v. Beacon Fed. Sav. & Loan</u>, 718 F.2d 49, 53 (2d Cir. 1983); <u>Gluck v. United States</u>, 771 F.2d 750, 756 (3d Cir. 1985).  Agrama argues that the summons should be

---

[5] The court notes that Agrama appears to have largely abandoned this line of reasoning in his Reply, arguing only briefly that to enforce the summons "would involve the court in the IRS's efforts to circumvent [] legal restrictions" and that "[p]rinciples of international comity require that domestic courts not take action that may cause violation of another nation's laws." (Reply at 9.)  As explained above, however, Agrama has made no showing that his production of the requested documents would violate any foreign law.

quashed because the investigation of which it is a part is tainted by the government's unlawful actions, namely (1) the allegedly unconstitutional searches executed by the FBI in 2006 and (2) the IRS' illegal procurement of MLAT documents, including the Chersicla Report.

### 1.   Fruit of the illegal 2006 searches

The alleged link between the investigation of which the instant petition to enforce is a part and the allegedly unconstitutional 2006 searches is a tortured and tenuous one. First, Agrama asserts that the IRS' current investigation, spanning fourteen tax years, is premised upon the Cheriscla Report.  This assertion appears to be supported by little more than speculation and the lone fact that the IRS' audit post-dated the issuance of the Chersicla Report.  The audit also post-dated, however, Agrama's voluntary disclosure to the IRS in 2009, not to mention the Agramas' expulsion from the voluntary disclosure program in early 2013 in the wake of the revelation that, contrary to his representation to the IRS, Agrama had in fact been investigated by Italian authorities and was ultimately convicted of tax evasion.

The implausible assertion that the IRS' entire investigation is based upon the Chersicla Report is, furthermore, but the first implausible inference necessary to connect the current summons to the 2006 searches.  Agrama concedes that the Chersicla Report is an analysis of documents obtained in Hong Kong, not Los Angeles. Indeed, as explained above, the FBI never transmitted any of the documents seized in Los Angeles in 2006 to Chersicla or any other Italian authority.  Nevertheless, Agrama contends that the Hong Kong documents "did not supernaturally bring themselves to the

1   attention of the Italian prosecution team," and that Chersicla

2   "unavoidably would have used knowledge gained through the

3   unconstitutional searches in Los Angeles."[6]   (Reply at 5:15-16, 19-

4   20.)

5        In other words, the argument goes, the instant summons, issued

6   in 2018, is the fruit of the poisonous tree because (1) the audit

7   from which the summons stems began in 2013, after the issuance of

8   the Chersicla Report, and therefore must have been premised upon

9   that report, which (2) although based upon Hong Kong documents, was

10  able to focus on certain of those documents only because (3)

11  Chersicla was able to glean crucial guiding information from

12  privileged material while physically present for improper searches

13  in Los Angeles in 2006, even though she never received copies of

14  any of the documents seized.   Even putting aside the question

15  whether any improper conduct by FBI agents in 2006 calls into

16  question the good faith of IRS agents investigating Agrama years

17  later, the facts alleged here are far too speculative to raise even

18  a plausible inference that the summons at issue here is, by way of

19  Hong Kong and Italy, the fruit of a poisonous tree planted in Los

20  Angeles in 2006.

21            2. Illegal acquisition of MLAT documents

22       Agrama also argues that, putting aside the issues with the

23  2006 searches, the investigation underlying the summons is tainted

24  because the MLAT documents upon which the investigation is

25  premised, including the Chersicla Report, were illegally obtained

26

27            [6] Although the Hong Kong search occurred after the Los Angeles

28  search, the MLAT request to Hong Kong predated the MLAT request to
    the United States.

by the IRS.  First, this argument too is premised upon the
assumption that the IRS' investigation was motivated by the
Chersicla Report.  As discussed above, that contention is not
plausible, particularly in light of Agrama's voluntary disclosure
and apparent misrepresentation of his legal status.

Even assuming, for the sake of argument, that the
investigation was spurred by the Chersicla report, Agrama does no
more than speculate that the IRS obtained the report, and other
MLAT documents, illegally.  Agrama asserts that a separate, double-
taxation treaty between the United States and Italy allows for the
exchange of tax-related information only by designated competent
authorities, namely the Secretary of the Treasury or his delegate.
Agrama further asserts that any such delegate "would likely have
known about and respected" MLAT restrictions on the use of MLAT
information.  (Reply at 7:9-20).  In other words, a U.S. designee
would have known that Italy was not free to divulge MLAT
information obtained from another country, and the U.S. delegate
would therefore have refused to accept any MLAT document proffered
by any Italian authority.[7]  Thus, the argument seems to go, the IRS
must have received the Chersicla Report outside of the treaty
process and, therefore, illegally.  Bare assertions, however, of
what a U.S. Treasury delegate "would likely have known," or would
have done under certain circumstances, and that the IRS could not
possibly have obtained documents any other legitimate way, do not
give rise to a plausible inference that the IRS did anything

---

[7] Although Agrama asserts that IRS agents revealed that the
IRS obtained documents "through channels or through the US
attaché," it is not clear to the court how such a statement
suggests any illegality.

illegal or in bad faith.[8]  See also Gluck, 771 F.2d at 757 ("It is clear . . . that quashal of a summons does not follow automatically from improper agency conduct.").

**IV.  Conclusion**

     For the reasons stated above, Respondent's Motion for an Evidentiary Hearing is DENIED.  A separate order compelling Respondent to comply with the summons shall issue.

IT IS SO ORDERED.

Dated: DECEMBER 2, 2020

                                        DEAN D. PREGERSON
                                        United States District Judge

---

     [8] The government asks that the court consider an in camera submission detailing the legal means by which the IRS obtained the Chersicla Report.  Because Agrama's contention that the document was illegally obtained is speculative, the court need not review, and has not reviewed, the government's in camera submission.  The government's ex parte application for leave to file the in camera submission is, therefore, denied as moot.